# Benson *v.* Berry-Dampeer Co.

(Division B. Oct. 6, 1930.)

[130 So. 157. No. 28817.]

**C. E. Gibson,** of Monticello, for appellant.

**Jno. H. Arrington**, of Monticello, for appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

The Berry-Dampeer Company, a partnership composed of J. J. Berry and Clyde Dampeer, filed a suit against the appellant, W. P. Benson, in which it was alleged that on some of the dates between January 1, 1926, and December 1, 1928, plaintiff sold and delivered to Benson at his special instance and request sundry goods, wares, and merchandise aggregating a value of two thousand four hundred twenty-five dollars and six cents; that the plaintiff was in the mercantile business and did both a cash and credit business; that the defendant was engaged in farming and as such employed a large number of hands to operate his farm; that the defendant arranged with the plaintiff to credit him with merchandise which he, in turn, supplied his tenants, and at his special instance

and request the accounts were to be kept in the names of the tenants, but with the understanding that at all times credit was extended to the defendant, Benson, and in accordance with such understanding credit was extended and the accounts carried in the shape requested by the defendant. Itemized accounts were attached to the declaration showing a separate account of W. P. Benson for goods personally bought for his own household, and separate accounts for each of the tenants upon his place for said years. Each account was duly itemized, and all of them were sworn to.

The defendant pleaded the general issue and filed an affidavit denying all items charged against him from July 21, 1928, to September 14, 1928, and pleaded that he was not indebted to said plaintiff in any sums so charged against him or in any other sum whatever. In the evidence the defendant stated that he limited this affidavit to his personal account and that he did not know whether items charged to the tenants were correct or not, but denied liability therefor. He also filed a special plea, that he did not within three years next before the commencement of this suit undertake or promise in manner and form, as the plaintiff hath complained, which he is ready to verify. He also gave notice under the general issue that on the trial of the case he would offer evidence to prove, or tend to prove, he did not contract with the plaintiff to pay the debts charged in the said action to Frank Roberson, Aron Roberson, Ab Roberson, Quitman Hedgepeth, Dave Weathersby, Obie Weathersby, and Edmund Butler, but that said credit was extended to them by the plaintiff, and he is in no wise responsible for the debt, default, or miscarriage of the said above-mentioned parties; and that he will offer evidence to show that all the items charged on the said account three years prior to the filing of this suit are now barred by the statute of limitation (Hemingway's Code 1927, section 2637);

and that he did not contract to pay ten per cent. cash price and six per cent. interest. He also filed a special plea that the plaintiff ought not to have or maintain the said action against him for the accounts charged against Frank Roberson, Aron Roberson, Ab Roberson, Quitman Hedgepeth, Davis Weathersby, Obie Weathersby, and Edmund Butler, because the accounts so charged and sued on were the individual accounts of the said parties, and not his accounts, and he did not at any time, as required by law, contract or agree to pay said accounts, and to do so would force him to answer for a debt or default or miscarriage of another person without the same being in writing; that he did not undertake or promise before or since the commencement of this suit to answer for the debt or default or miscarriage of the above-named parties. which he is ready to verify.

Replications were filed to the pleas tendering issue, etc. The plaintiff testified, in substance, that Mr. Benson came to its place of business and wanted to make arrangement to have credit extended him for himself and his tenants, but that he wanted the accounts kept separate so that there would be no confusion in the accounts; that he wanted his personal account charged' to him and the account of each tenant charged to such tenant separately, but that the credit was to be extended to him; and that an agreement was made whereby an addition of ten per cent was made to the amount of the usual cash price for all goods that were not paid for within thirty days, or were carried until fall of the year. He further testified that during the period covered by the suit the goods were charged at cash prices to the tenants with ten per cent added for goods carried to the fall, and any balance not paid during the fall of the year would be charged, and were charged, interest at the rate of six per cent per annum on such balances. In reference to the arrangement the plaintiff testified as follows:

"Q. State to the jury Mr. Dampeer what Mr. W. P. Benson is engaged in, if you know? A. Principally farming.

"Q. Does he work a good many hands or tenants? A. Yes, sir.

"Q. I'll ask you to state to the jury whether or not Mr. Benson had any agreement with you or your firm as to furnishing those tenants and how the arrangement and what the arrangement was? A. Yes, sir; we've had an agreement to that effect, every year up until this year.

"Q. Every year from when? A. From 1925 and either further back than that when I was doing business under a different name under a different partnership.

"Q. This present firm? A. Back since 1925.

"Q. State to the jury what that agreement was and how it came about? A. Well, it just came about—

"Q. What did Mr. Benson say to you or your firm? A. He applied to us for furnishings to furnish his place.

"Q. Well, tell the jury as near as you can the actual conversation and the agreement had between you and Mr. Benson or your firm and Mr. Benson? State what Mr. Benson said and what you all said? A. Well, in 1926, I suppose probably in January, Mr. Benson approached us and asked if we would be able to handle his business for another year and we went into it as to about what it would be and as to how he wanted it handled and reached an agreement whereby that he and his tenants would do business with us for the year 1926. At that time it was generally understood by all parties concerned as to about how much it would run, how much fertilizer he'd need and how he'd want his business carried on and the kind of prices we agreed to sell him the merchandise at and all those things.

"Q. Well, all of it was gone over? A. Yes, sir.

"Q. Did you reach an agreement? A. We did.

"Q. There was that agreement to sell on a credit price or cash price? A. Well, it's what we term a cash price.

"Q. What you would term a cash price? A. Yes, sir; it's really a credit price but we refer to it as a cash price.

"Q. Explain it to the jury? A. What we mean by that price is this, we are supposed to have just one price in our store if a man buys it and pays for it he gets it for the cash price, say it's a dollar and he gets it for a dollar and if he buys it and pays for it in the fall he pays one dollar and ten cents and we call that carrying charges, that goes on everybody's account that's not paid until fall.

"Q. Well now, while you are on that just state what the agreement was as to how these goods to whom were they furnished, to Mr. Benson or his tenants, state how that was? A. The agreement with us and Mr. Benson was we were to furnish his entire place and charging all items against the account and keeping it separated to the extent that each man's separate account would be on a separate page and would be no conflict between his hands account and his personal account; each account was to be kept separate.

"Q. Each account separate? A. Yes, sir.

"Q. And to whom was it to be charged? A. Well, it was to be charged to Mr. Benson in the name of the tenant.

"Q. Well, to whom was that credit extended, to Mr. Benson or his tenant? A. Mr. Benson."

It was also shown by the testimony for the plaintiff that the way it actually entered the accounts upon the books was to charge the account to the tenant by name with the notation, "W. P. Benson, surety." Plaintiff testified, however, that this was merely for their own information, and that the agreement was that the accounts were to be charged to the tenant, but the credit extended to Mr. Benson. Both of the plaintiffs testified to the agreement with Mr. Benson as to said arrangement. Mr. Benson denied making such contract and denied knowing that he was to be charged or held liable for these ac-

counts until the latter part of, or late in the year of, 1928, or a short while before the suit was filed.

Some of the tenants testified that if Benson was to pay their accounts they did not know of it; that they thought they were trading on their own account. Some of the tenants did not testify. There was testimony to the effect that some fertilizer was sold at a price higher than the farm bureau or farmers' organization sold the same and similar fertilizer; and that in addition to this higher price charged by plaintiff (which made the price at which defendant bought a credit price) there was added a ten per cent charge and six per cent interest on the total.

There was some contention that Benson ought to have certain credits for sales of cotton to the plaintiffs by him and his tenants which were not credited, it is claimed. There was some conflict between the plaintiff and defendant upon this proposition, and the whole question was submitted to the jury under instructions of the court, which we think adequately presented the law as applied to the contentions of respective parties and their theories of the case as shown by their respective evidence and contentions. Among other things, the court charged for the plaintiff that if the jury believe from the evidence that the plaintiffs and the defendants made an agreement by and between them that they would sell him goods for himself and his tenants at cash price plus ten per cent carrying charge thereon to be paid in the fall and the defendant agreed to such prices and obtained the goods, then the account as charged is not usurious and only meant that was the price of the goods on time and not a usurious charge but the price of the goods on time.

It was charged for the plaintiff that under the law of this case the question of liability is determined by the fact as to whom the credit was extended, and this is true regardless of how the account was carried on the books of the plaintiff or marked for identification or reference, and if the jury believe from the preponderance of the

evidence in this case that the credit was extended to W. P. Benson, it is their duty to find for the plaintiff in such amount as is found due, on all the accounts sued on. The jury was also instructed that if the agreement was that the credit was to be extended to Benson for his tenants, no written memorandum or contract in writing was necessary in order.to fix liability on Benson. The court also gave instruction as to the applicability of payments, to which no objection can be found. The jury was also instructed that the sale price of the farm bureau is not binding upon the plaintiff, but the test is the fair, reasonable market value of the fertilizer at the time and place of the sale and delivery of same.

For the defendant the court instructed that if the jury believe from the preponderance of the evidence that the plaintiff charged the tenants named in the exhibit to the declaration with the various and sundry items named therein, and looked to W. P. Benson as surety, then their verdict should be for the defendant, because a person cannot be held to answer for the debt, default, or miscarriage of another unless the agreement to do so is in writing. It further instructed for the defendant that the jury must believe from the clear preponderance of the testimony and all circumstances in testimony that the plaintiff had a contract with the defendant whereby and wherein it was agreed that the plaintiff should look solely to the defendant for the payment of accounts of such tenants; and if the jury is not convinced by the preponderance of the testimony that plaintiff and defendant entered into such agreement that Benson alone should be liable, and that the plaintiff would not look to the tenants for the purpose of collecting these accounts, then the jury should find for the defendant on all the accounts of such tenants. It also instructed for the defendant that the jury could not find for any item that was due more than three years prior to thirty days before the date the suit was brought. It also instructed that if the jury be-

lieve the plaintiff should not credit the defendant with the cotton, then it should find the value of such cotton and credit defendant with same. The jury was charged that if the plaintiff charged the tenants and looked to Benson as surety for the accounts, and in this way entered accounts on his books, and if Benson never gave the plaintiff any written agreement to pay the accounts, the thing to do was to find for the defendant. It also instructed the jury that the books of account of the plaintiff were in evidence in the case, and the jury should pass upon the case in regard to the recitations made in said books, unless they are shown to be incorrect. It further instructed the jury that if they believed from the evidence and circumstances in the case that the plaintiff charged the defendant credit prices for the merchandise on his account, and did not charge him with the current cash price for such merchandise, then the plaintiff cannot recover the ten per cent carrying charge, and the jury should so find.

We think these instructions, applied to the conflicting evidence, presented fairly the theories of the respective parties, and the jury's finding for the plaintiff for the full amount sued for was authorized by the law and the evidence, and the judgment of the court below upon such verdict must be affirmed.

Affirmed.